PENTEC, INC., and Bob
Allen, Appellees,

v.

GRAPHIC CONTROLS
CORP., Appellant.

Appeal No. 85–1565.

United States Court of Appeals,
Federal Circuit.

Nov. 1, 1985.

All these reactions would explain the low evolution of formaldehyde and the high evolution of water during the second stage of hardening.

MARKEY, Chief Judge.

Appeal from a judgment of the United States District Court for the Central District of California declaring claims 1–4 of U.S. Patent No. 3,983,569 to James Hubbard and Charles Erdman ('569 patent) invalid for obviousness and not infringed and dismissing the counterclaims of Graphic Controls, Inc. (GC) for infringement and unfair competition...224 USPQ 976 (C.D. Cal.1984). We *affirm.*

### Background

Pentec, Inc. and Bob Allen (Pentec) sued for a declaration of invalidity and non-infringement of the '569 patent. GC, as assignee of the patent, counterclaimed for infringement of claims 1–4 and for unfair competition. After a nonjury trial, the district court adopted in full the findings and conclusions submitted by Pentec, and declared the claims in suit invalid and not infringed. The district court further held that Pentec did not compete unfairly under the Lanham Act, 15 U.S.C. § 1125(a), or under California law.

### A. *Prior Technology*

The recording instruments here involved are formed of thin, very light, and small elements. Before 1970, recording instruments included metal "bucket" pens, each affixed permanently to a pen arm, with refillable liquid ink supplies. Users experienced difficulties in maintaining ink flow and refilling.

During the 1970's, the industry developed disposable pens with fibrous ink reservoirs, solving the flow and refill problems. However, frequent replacement of the disposable pen risked upsetting or damaging the delicate pen arm. During the early 1970's, GC and its competitors used folded-over metal tabs to attach the pen.

In 1973, GC introduced its first disposable "Series 10" pen for use on round chart recorders. That pen had the same fastening means as GC's earlier "MARK–TROL" pen. The Sanford Corporation (Sanford)

Paul F. Prestia, Ratner & Prestia, Valley Forge, Pa., for appellant. With him on the brief was Lawrence A. Husick, Valley Forge, Pa., LeRoy T. Rahn, Christie, Parker & Hale, of Pasadena, Cal., of counsel.

Paul L. Gardner, Spensley, Horn, Jubas & Lubitz, Los Angeles, Cal., for appellees.

Before MARKEY, Chief Judge, BENNETT, Circuit Judge, and HARVEY *, Senior District Judge.

---

* The Honorable James Harvey, United States District Court for the Eastern District of Michigan, sitting by designation.

sought to develop disposable pens with a better fastening means. Sanford's efforts produced U.S. Patent No. 3,893,130 to Charles Browning and Gilbert Perrigo (Browning) which issued July 1, 1975. That patent disclosed a plastic channel on the pen as a means for attaching it to the arm. However, that means proved insecure. An improved version was disclosed in U.S. Patent No. 3,934,255 to Guy Taylor (Taylor) which issued January 20, 1976 on an application filed June 3, 1974.

On September 28, 1976, the '569 patent issued from a continuation-in-part application to Hubbard and Erdman who assigned it to GC. The date of the original application, January 10, 1975, has been stipulated to have been the date of invention.

### B. The '569 Patent

In 1977, GC introduced to the market its "Series 39" pen, which embodied the Hubbard invention disclosed in the '569 patent. The Hubbard invention includes a pen arm having an "integrally molded hinge member" for folding over against the pen body. Claim 1, the only independent claim in issue and from which claims 2–4 depend, is in Jepson form. It reads:

> In an instrument marker pen body including an ink reservoir and means for receiving a writing tip, the improvement comprising a pen arm holding means consisting of an integrally molded hinged member adapted to fold against a surface of the pen body and to be locked against said surface by engageable locking means and to receive and secure in place against said surface a pen arm when said hinged member is in its folded and locked position.

Claim 2 adds ridges on the hinge to grip the arm. Claim 3 adds a channel on the pen body to hold the arm on each side. Claim 4 adds a disposable pen having a fibrous body containing ink.

GC successfully marketed under its "Series 39" designation many models of its "snap-on" recording instrument pens embodying the inventions claimed in the '569 patent.

### C. Pentec's Actions

Shortly after setting up his wholly owned Pentec corporation in 1979, Allen requested, and GC refused, a license under the '569 patent.

Pentec tried to compete with its first "Series 390" pen. However, Pentec withdrew that pen from the market because it did not mount securely to the arm.

In 1982, Pentec introduced a second "Series 390" pen. It has a hinged clasp attached to the side of the pen and is the product accused as an infringement in GC's counterclaim. It differs from the invention claimed in '569 patent solely in that its hinged clasp is separately molded and ultrasonically welded in a separate process rather than being "integrally molded" in one step.

Pentec introduced the accused pen without advice of counsel. Bob Allen testified that he believed the '569 patent to be invalid and that Pentec's pen did not infringe it. When GC charged it with infringement of the '569 patent, Pentec sought counsel and initiated this declaratory judgment action in 1983.

### D. District Court Proceedings

Trial was held on June 5, 7, 8, 11, 12, and 13, 1984. On November 13, 1984, the district court issued judgment in favor of Pentec. The record indicates that the court crossed out "proposed" from the title page of the findings and conclusions submitted by Pentec and adopted them verbatim.

The adopted findings and conclusions relating to validity say: (1) Pentec rebutted the presumption of validity by clear and convincing evidence; (2) the '569 patent was invalid in light of the prior art because the Hubbard invention would have been obvious to one of ordinary skill in the art; (3) GC had not clearly established a nexus between the commercial success of its patented pen and the claimed invention; and (4) GC had not shown existence of a long felt need for a hinged fastener.

The district court found Pentec not guilty of unfair competition because its "Series 390" merely designated the pen

model, not the source of its manufacture, a conclusion bolstered by an absence of actual confusion, an absence caused by the marking of "Pentec" on its pens.

### Issues Presented

Whether the district court erred in: (1) declaring claims 1–4 invalid for obviousness under § 103;[1] (2) finding non-infringement; (3) dismissing GC's counterclaim for unfair competition.

### OPINION

#### A. Standard of Review

■ This court reviews factual findings underlying a conclusion of obviousness and a finding of infringement under the clearly erroneous standard. Fed.R. Civ.P. 52(a). A finding is clearly erroneous when the reviewing court is left with a firm conviction that a mistake has been made, notwithstanding the presence of evidence that may support it. *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 541, 92 L.Ed. 746, 76 U.S.P.Q. 430, 444 (1948). Though adoption of proposed findings verbatim may increase wariness on review, the clearly erroneous standard is not thereby rendered inapplicable. *Anderson v. City of Bessemer City, N.C.*, — U.S. ——, ——, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985); *Rosemount, Inc. v. Beckman Instruments, Inc.*, 727 F.2d 1540, 1544 n. 4, 221 USPQ 1, 5 n. 4 (Fed. Cir.1984). The ultimate obviousness determination is a conclusion of law not subject to the clearly erroneous standard.

■ GC, as appellant, bears the burden of persuading us that the district court committed reversible legal error in its determination that the invention would have been obvious, or that its probative findings underlying that determination were clearly erroneous. *Atlas Powder Co. v. E.I. DuPont DeNemours*, 750 F.2d 1569, 1573, 224 USPQ 409, 411 (Fed.Cir.1984).

#### B. Obviousness

GC contends that the district court erred in its findings on: (1) the scope and content of the prior art; (2) the level of ordinary skill; (3) the differences between the prior art and the claimed invention; (4) the objective evidence of nonobviousness; and erred (5) in applying a special "combination patent" rule of law.

#### (1) Scope and Content of the Prior Art

Section 103, as construed by the Supreme Court in *Graham v. John Deere*, 383 U.S. 1, 17, 86 S.Ct. 684, 693, 15 L.Ed.2d 545, 148 USPQ 459, 467 (1966), makes the factual inquiry into the scope and content of the prior art the initial step in determining the obviousness of a claimed invention. At the outset, GC contends there is nothing in the record suggesting that one of ordinary skill in the pen art would have looked to the plastic hinge and fastener art without prior knowledge of the Hubbard invention. GC thus argues that the hinge and fastener art was "non-analogous", i.e., that it was improperly looked to by the district court in determining whether the Hubbard invention would or would not have been obvious.

■ Those of ordinary skill in the art may be presumed to have knowledge of arts "reasonably pertinent to the particular problem with which the inventor was involved." *In re Wood*, 599 F.2d 1032, 1036, 202 USPQ 171, 174 (CCPA 1979). However, that prior art may not be gathered with the claimed invention in mind. *In re Antle*, 444 F.2d 1168, 1171, 170 USPQ 285, 287 (CCPA 1971).

The problem confronting Hubbard was the need for a simple holding means to enable frequent, secure attachment and easy removal of a marker pen to and from a pen arm. Nothing in the record indicates that one trying to solve that problem would not have looked to the fastener and hinge art. *See Stratoflex, Inc. v. Aeroquip*

---

1. 35 U.S.C. § 103 provides in pertinent part:
   A patent may not be obtained ... if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains.

*Corp.*, 713 F.2d 1530, 1535, 218 USPQ 871, 876 (Fed.Cir.1983). In fact, Hubbard testified at a deposition read into the record at trial that what he did, in effect, was to select a plastic hinge from the literature he had read and incorporate it into a plastic bucket pen for securing it on a pen arm. Although Hubbard later testified at trial that that selection occurred after he had conceived the invention, the district court apparently rejected that testimony. That rejection is clearly supported by Hubbard's admission that, before coming to work for GC in 1970, he had read and collected literature describing the advantages of "living hinges", and had thought of those articles when the project to design a fastener for the pen was first assigned to him.

■ The finding that the fastener and hinge art is relevant, and thus within the scope of the prior art to which one having ordinary skill in the art would have looked, was not clearly erroneous. The district court's finding is also supported by Hubbard's statement that what he claimed was a "new development in the use of plastic hinges to attach a pen to a pen arm."

The district court correctly found that the relevant prior art of record consists here of these patents and publications:

United States Patent Nos. 1,895,727 to Pearce and 3,774,230 to Tullos teach metal recorder pens having metal hinges or tabs which are folded back over the pen arm.

United States Patent No. 3,438,058 to Davis (Davis) teaches a metal attachment clip under which a metal pen arm is fastened. The clip has a dap or dimple to provide a tighter fit on the pen arm. Browning teaches the use of a plastic channel integrally molded with a plastic pen body for receiving and retaining the pen arm. Taylor modified Browning by using pairs of plastic channels.

United States Patent No. 3,824,654 to Takabayashi (Takabayashi) teaches an integrally molded plastic connector or adjustor which is folded over and snapped

closed. On the fastener are antiskid bars and an interlocking bar on one side with a recessed portion on the other to receive the bar for snapping it closed. United States Patent No. 3,713,622 to Dinger (Dinger) teaches a tube closure device using bendable arms connected by integral hinges.

Three articles published in *Modern Plastics* disclose the design and advantages of plastic fasteners and hinges. The October 1963 article, "Plastics Add New Dimensions to Fastener Design", suggested the design in plastic of a "thin cross-section in a clip [as found in Davis] that can double as an integral hinge . . . .", and also stated, "perhaps the most popular approach has been to mold the fastener in as an integral part of the product."

Of the foregoing, the examiner cited only Taylor.

■ Although Pentec introduced a substantial quantity of relevant prior art not cited by the examiner, it continued to bear the burden of proving facts compelling a holding of invalidity, *Stratoflex Inc. v. Aeroquip*, 713 F.2d 1530, 1534, 218 USPQ 871, 875 (Fed.Cir.1983); *see* 35 U.S.C. § 282, and, though that burden may under such circumstances be more easily carried, *American Hoist & Derrick Co. v. Sowa & Sons, Inc.*, 725 F.2d 1350, 1359–60, 220 USPQ 763, 770 (Fed.Cir.1984), whether that burden can be said to have been carried requires careful consideration of whether the claimed invention would have been obvious in light of all relevant prior art of record. *Solder Removal Co. v. United States Int'l Trade Comm'n.*, 582 F.2d 628, 632, 199 USPQ 129, 132 (CCPA 1978).

*(2) Level of Ordinary Skill*

The district court said that the level of ordinary skill in 1974 in the art to which the Hubbard invention pertains was that of one with "some formal engineering education and one or more years of engineering design experience."[2] GC concedes that

---

**2.** In its Conclusions of Law, the district court stated that a determination of the level of ordi-

that finding is "perhaps not clearly erroneous."

### (3) Differences Between the Claimed Invention and the Prior Art

The difference between the claimed invention and the prior art resides in the replacement of the metal attachment clip of Davis, or the channelled members of Browning or Taylor, with an "integrally molded hinge member." Similar plastic hinges or "clamps" were disclosed in Takabayashi and Dinger, though not in combination with plastic pens. Hubbard testified that the '569 patent combined a known plastic hinge with a known plastic pen, the hinge serving to secure a pen on a pen arm. Thus the true question is whether it would have been obvious to those of ordinary skill in the art in 1975 to make that combination. *ACS Hospital Systems, Inc. v. Montefiore Hospital*, 732 F.2d 1572, 1577, 221 USPQ 929, 933 (Fed.Cir.1984).

GC contends that the district court did not consider the claimed invention as a whole pursuant to § 103, *see Carl Schenck, A.G. v. Nortron Corp.*, 713 F.2d 782, 785, 218 USPQ 698, 700 (Fed.Cir.1983), i.e., that the court "denigrate[d]" the patent by overemphasizing the hinged member and de-emphasizing its combination with a plastic pen, and improperly separated the preamble from the improvement clause of the Jepson claim. Although a preamble is impliedly admitted to be prior art when a Jepson claim is used, *see In re Ehrreich*, 590 F.2d 902, 909–10, 200 USPQ 504, 510 (CCPA 1979); 37 C.F.R. § 1.75(e) (1984), unless the preamble is the inventor's own work, *Reading & Bates Construction Co. v. Baker Energy Resources Corp.*, 748 F.2d 645, 649, 228 USPQ 1168, 1172 (Fed. Cir.1984), the claimed invention consists of the preamble in combination with the improvement, *see Manual of Patent Examining Procedure* § 608.01(m) (5th ed. 1983).

We cannot conclude that the district court denigrated or mischaracterized the invention claimed in the '569 patent when it

analyzed the differences between the claimed structure and those of the prior art. Our conclusion is supported by the inventor's testimony, in which he said, "our invention consisted of a new development in the use of plastic hinges to attach a pen to a pen arm."

### (4) Objective Evidence

■ Objective evidence of nonobviousness, when present, must always be considered before reaching a legal conclusion under § 103. *Stratoflex, Inc. v. Aeroquip Corp.*, 713 F.2d 1530, 1538, 218 USPQ 871, 879 (Fed.Cir.1983). "Indeed, evidence of secondary considerations may often be the most probative and cogent evidence in the record. It may often establish that an invention appearing to have been obvious in light of the prior art was not." *Id.*

■ For a claimed invention's commercial success to be given substantial weight, a nexus must be established between it and the merits of the claimed invention. *Cable Electric Prods. v. Genmark, Inc.*, 770 F.2d 1015, 1026, 226 USPQ 881, 887 (Fed.Cir. 1985); *Solder Removal Co. v. United States Int'l Trade Comm'n.*, 582 F.2d 628, 637, 199 USPQ 129, 137 (CCPA 1978). The district court found that GC failed to prove that the undisputed commercial success of its "Series 39" pen was attributable to the claimed invention. The district court based that finding on the testimony of the inventor and Adams, GC's former general manager. They testified that when the plastic hinge was combined with nondisposable pens, that combination was received "coolly" in the marketplace. It was only when the plastic hinge was combined with disposable pens that that combination was received "extremely warmly." The district court concluded that the success of the latter combination was caused by the marketplace's readiness for disposable pens and the great sums spent by GC in advertising its "Series 39" pen.

That the structure of claims 1–3 was received "coolly" when the "pen body" of

---

nary skill here is unnecessary because the subject matter is easily understandable. *Chore-*

*Time Equipment v. Cumberland*, 713 F.2d 774, 779, 218 USPQ 673, 676 (Fed.Cir.1983).

those claims was nondisposable does not preclude GC from reliance upon the success achieved with the structure of claim 4, in which the "pen body" of that claim is, as set forth in the claim, "disposable". It is undisputed that the structure of claim 4 was commercially successful, that GC's share of the recorder pen market grew between 1980 and 1983, and that GC sold about twice as many pens as the rest of the industry combined. Nonetheless, GC's showing of commercial success on this record falls just short of a showing sufficient to tilt toward a required conclusion of non-obviousness the scales on which rests all the evidence.

The record is clear that, upon introducing the claimed invention in 1977, GC launched an extensive advertising campaign and continued that campaign for three years. That GC reduced its advertising budget in 1980–1983 is of little moment, absent a showing that continued high sales volume was not due to the extensive campaign of 1977–1980. The district court's finding that GC's promotional campaign contributed to the patented pen's commercial success has not been shown to have been clearly erroneous.

The record shows that GC was the leader in the recording pen field well before the issuance of its '569 patent. During the 1970's, GC had greatly increased the number of its personnel and the size of its facilities. A former regional sales manager for GC testified that it was selling in the early 1970's its "MARK–TROL" pen at levels similar to those achieved with the "Series 39" pen. Because GC was clearly the market leader well before the introduction of the "Series 39" pen, its sales figures cannot be given controlling weight in determining the effect of commercial success in this case on the question of obviousness. *Cf. Schwinn Bicycle Co. v. Goodyear Tire & Rubber Co.,* 444 F.2d 295, 300, 168 USPQ 258, 262 (9th Cir.1970) (sponsorship by market leader "may be largely responsible for the success of the design"). On the present record, it cannot be said that the commercial success here may not have been due in large part to "other economic

and commercial factors unrelated to the technical quality of the patented subject matter." *Cable Electric, supra,* 770 F.2d at 1027, 226 USPQ at 888 (Fed.Cir.1985). In sum, GC has simply failed on this record to show the required nexus.

■ The district court found that GC failed to show any long felt need for the claimed invention. In its brief, GC cites one page of testimony of its former sales manager in support of its long felt need argument. That testimony indicates the need for disposable pens *per se,* not for the claimed invention. In its reply brief, GC attempted to show the long felt need for the claimed invention by pointing to poor sales of other disposable pens, a reiteration of its commercial success argument. In light of the short period between introduction of disposable pens and the time the invention was made, the district court's finding that GC failed to prove existence of a long felt need was not clearly erroneous.

Other arguments raised by GC, but not mentioned by the district court are: (1) failure of others, including Pentec, to design a competitive pen; (2) praise for the claimed invention; (3) absence of infringement between 1977 and 1982, and license requests by Pentec and Sanford; and (4) Pentec's copying of the claimed invention.

No evidence was submitted indicating that others failed after long-continued attempts to solve the fastening problem. The efforts of Taylor and Browning, which resulted in the use of channels as fastening means, occurred over a short period substantially coterminous with those of Hubbard.

That an owner of a prior art patent praised the claimed invention as "better" than what his patent disclosed does not add sufficiently to the record to warrant a conclusion of non-obviousness.

GC's third argument suffers from a lack of record evidence that those who refrained from infringement and who sought licenses did so out of respect for the strength of the patent and not out of a desire to avoid the costs of litigation.

Lastly, copying of a claimed invention can be evidence of nonobviousness. *Panduit Corp. v. Dennison Manufacturing*, 774 F.2d 1082, 1099 (Fed.Cir.1985). In *Panduit*, however, an admitted infringer had failed to produce a satisfactory solution after ten years of effort and expense. In the present case, Pentec's effort to develop their own solution was not shown to have been extensive, its product is not identical to the claimed invention, and it vigorously denied infringement. GC's copying argument can, accordingly, be given little weight.

The objective evidence proffered by GC is insufficient to require reversal of the district court's determination that the claimed invention would have been obvious to one of ordinary skill in the art when it was made.

### (5) *"Combination Patent"*

In arguing that the district court erroneously based its obviousness conclusion on a special "combination patent" rule, GC points to conclusion of law 1, wherein the court indicated that "a combination which only unites old elements with no change in their functions" is not patentable.

In 1952 Patent Act provides no basis for any separate "combination patent" classification, *Raytheon Co. v. Roper Corp.*, 724 F.2d 951, 961, 220 USPQ 592, 600 (Fed.Cir.1983), and "virtually every claimed invention is a combination of old elements," *Medtronic, Inc. v. Cardiac Pacemakers, Inc.* 721 F.2d 1563, 1566, 220 USPQ 97, 99–100 (Fed.Cir.1983).

This court hears appeals from judgments, not from language used in justification of the judgment appealed from. *Fromson v. Advance Offset Plate, Inc.*, 755 F.2d 1549, 1556, 225 USPQ 26, 31 (Fed. Cir.1985). Though "the language in an opinion, or in a set of findings and conclusions, may indicate that numerous harmful errors of law produced an erroneous conclusion...." *Lindemann, supra*, 730 F.2d at 1458, 221 USPQ at 485, and though the language appearing in conclusion 1 is incorrect, "it cannot be said that the appealed judgment was in this case so influenced thereby as to require reversal," *Medtronic, supra*, 721 F.2d at 1566, 220 USPQ at 100. *See Stratoflex, supra*, 713 F.2d at 1540, 218 USPQ at 880.

### Conclusion on Obviousness

On the entire record, GC has failed to establish that the district court erred in its application of the *Graham* factors, in its evaluation of the claimed invention and the prior art, or in its treatment of the objective evidence. That the language adopted by the court mistates the law at various points does not in this case require reversal, there being in the record sufficient evidence to support the judgment. Accordingly, the judgment declaring claims 1–4 invalid is affirmed.[3]

### C. *Unfair Competition*

GC alleges that Pentec has violated § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), and California common law, by designating its pens "Series 390" in imitation of the "Series 39" term used by GC. Because this court does not have exclusive jurisdiction over those claims, the discernable law established by the Ninth Circuit will be applied. *CPG Products Corp. v. Pegasus Luggage, Inc.*, 776 F.2d 1007, 1011 (Fed.Cir.1985).

The Ninth Circuit recognizes no essential difference between claims of unfair competition, whether brought under § 43(a) or under California state law. *See K–S–H Plastics v. Carolize, Inc.*, 408 F.2d 54, 59 n. 2, 161 USPQ 75, 78 n. 2 (9th Cir.), *cert. denied*, 396 U.S. 825, 90 S.Ct. 69, 24 L.Ed.2d 76 (1969). Accordingly, we treat jointly the separate counts brought by GC under those laws.

In respect of unfair competition, "the ultimate test is whether the public is likely to be deceived or confused...." *New West Corp. v. NYM Company of Cal-*

---

**3.** Hence no need exists for discussion here of the district court's finding of non-infringement.

*ifornia, Inc.*, 595 F.2d 1194, 1201, 202 USPQ 643, 649 (9th Cir.1979).

GC contends that this court may independently review the "foundational factors" underlying a trial court's determination on likelihood of confusion, citing *Bandag, Inc. v. Al Bolser's Tire Stores, Inc.*, 750 F.2d 903, 912–13, 223 USPQ 982, 998 (Fed.Cir. 1984) (following Ninth Circuit law). In *Bandag*, however, the evidence concerning the likelihood of confusion was "overwhelmingly undisputed." Here, GC disputes the district court's finding that "Series 39" and "Series 390" do not designate sources of origin. GC must not merely dispute the district court's findings, but must show them to have been clearly erroneous. *See J.B. Williams Co. v. Le Conte Cosmetics, Inc.*, 523 F.2d 187, 190, 186 USPQ 317, 319 (9th Cir.1975), *cert. denied*, 424 U.S. 913, 96 S.Ct. 1110, 47 L.Ed.2d 317 (1976).

■ The district court found that "Series 39" and "Series 390" on GC's and Pentec's pens, respectively, were model designations and did not serve to "designate the manufacturers' [source of origin]." The court further found that Pentec clearly marks its pens with the Pentec name, that Pentec had not "palmed off" its pens as those of GC and had not tried to mislead customers, and that no actual confusion had occurred. The court then concluded that GC's claim of unfair competition must be dismissed, a conclusion necessarily resting on the view that likelihood of confusion had not been shown. GC has not on this record shown those findings to have been clearly erroneous, and has not shown that conclusion unsupported by those findings.

GC having failed to show that the district court's relevant findings were clearly erroneous, the judgment dismissing the unfair competition claim must be affirmed.

## Conclusion

The judgment of the district court declaring claims 1–4 of the '569 patent invalid and dismissing the counterclaims is affirmed.

AFFIRMED.

JAMES HARVEY, Senior District Judge, concurring.

While I concur in the majority opinion, I write separately to express my concern with the posture in which this case comes before us. Following a nonjury trial, the District Court issued a four sentence decision holding that "[t]he Court is of the opinion that judgment should be in favor of plaintiff [Pentec] and against defendant [Graphic Controls]." The Court, however, gave no indication as to the basis for its holding and noted that it would consider any proposed findings submitted by Pentec. Pentec submitted its proposed findings on November 14, 1984. On November 15, 1984, the District Court adopted without change Pentec's proposed findings of fact and conclusions of law as the opinion of the Court. The Court did this by simply scratching the word "proposed" off of the document submitted by Pentec and by then filing it. Similarly, the proposed judgment was adopted without change on November 15, 1984. Nowhere in the record does it appear that Graphic Controls had any opportunity to respond or object to the proposed findings submitted by Pentec.

In requiring a District Court to "find the facts specially and state separately its conclusions of law thereon," Rule 52(a) serves a threefold purpose. It ensures care in the preparation of an opinion, defines the *res judicata* limitations of a decision for future cases and provides appellate courts with the benefit of the District Court's insights into a case. *See Roberts v. Ross*, 344 F.2d 747, 751–52 (3rd Cir.1965); Fed.R.Evid. 52 advisory committee note; J. Wright, The Nonjury Trial—Preparing Findings of Fact, Conclusions of Law, and Opinions, Seminar for Newly Appointed United States District Judges (1962); and Wright & Miller, Federal Practice and Procedure § 2571 at 679–80.

The purposes served by Rule 52(a) are largely defeated in cases in which the find-

ings of fact and conclusions of law more accurately reflect the thinking of the prevailing attorney than that of the Court. For only in struggling through the various factual and legal issues itself can a Court be certain that the result which is reached is the result that it would have intended. When this function is instead delegated to the prevailing attorney, factual inconsistencies and difficult legal issues are often improperly minimized. *See Roberts v. Ross, supra.*

The Supreme Court has recognized the various problems which are created when a District Court adopts proposed findings of fact and conclusions of law without change. Nevertheless, as the majority notes, the Supreme Court has indicated that such findings are not to be rejected out of hand and are still subject to a clearly erroneous standard of review. *Anderson v. Bessemer City,* — U.S. —, —, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518, 527 (1985); *United States v. Marine Bancorporation,* 418 U.S. 602, 615 n. 13, 94 S.Ct. 2856, 2866 n. 13, 41 L.Ed.2d 978 (1974); and *United States v. El Paso Natural Gas Co.,* 376 U.S. 651, 656–57 (1964). Notably, however, *Anderson* is factually distinguishable from the case at bar. The Court in *Anderson* specifically found that the trial judge had issued a preliminary opinion, that the judge had not "uncritically accepted the [proposed] findings" and that the opposing party had been given an opportunity to respond to the proposed findings. — U.S. at —, 105 S.Ct. at 1510, 84 L.Ed.2d at 527. Similarly, the Court in *Rosemount, Inc. v. Beckman Instruments, Inc.,* 727 F.2d 1540, 1544 n. 4 (Fed.Cir.1984), found that the District Court issued a memorandum decision. Finally, it is worth noting that although the Supreme Court has "suggest[ed] that even when the trial judge adopts proposed findings verbatim, the findings are those of the court and may be reversed only if clearly erroneous," it has at the same time strongly criticized the practice. *Anderson,* — U.S. at —, 105 S.Ct. at 1510, 84 L.Ed.2d at 527. *See also, Marine Bancorporation,* and *El Paso Natural Gas Co., supra.*

I concur in the majority opinion because I find that although the Supreme Court has criticized the practice of adopting proposed findings verbatim, it has held that the clearly erroneous standard is not thereby rendered inapplicable. I agree with the majority that the findings of fact in this case withstand scrutiny under such a standard of review. Nevertheless, I feel that several very close factual questions were presented in this case and wonder whether the District Court would have reached the same result had it separately prepared the findings.

Although I feel constrained to agree that this Court must decide this case as it has, I believe that an alternative exists which would more effectively protect the procedures set forth in Rule 52(a). That alternative would be to simply remand cases such as the one now before this Court to the District Court for its reconsideration. Such a rule would have two beneficial effects. First, it would ensure proper consideration of a case by a District Court. Second, it would leave intact the clearly erroneous standard of review; a standard which appears to have been undermined *sub silencio* in some cases on appeal in an effort by the Courts of Appeal to compensate for inadequate consideration by a District Court.

By this suggestion, I do not denigrate the value and importance of having the parties assist the Court in its task by submitting proposed findings of fact and conclusions of law. Moreover, I do not envision this procedure to be one that will be used frequently. When, however, the record contains no indication of the District Court's own reasoning for its holding, and when the proposed findings have been adopted verbatim by a District Court without any opportunity for the opposing party to file objections, the better course of action would be to remand the case to the District Court for its reconsideration. Nevertheless, while I believe that such a practice would be in keeping with the spirit, if not the letter, of Rule 52, it has not yet been approved by the Supreme Court

and I therefore concur in the majority opinion.