**SPINDELFABRIK SUESSEN–SCHURR STAHLECKER & GRILL GmbH, et al., Appellees,**

v.

**SCHUBERT & SALZER MASCHINEN-FABRIK AKTIENGESELLSCHAFT and Schubert & Salzer Machine Works, Inc., Appellants.**

Appeal Nos. 86–561, 86–682.

United States Court of Appeals, Federal Circuit.

Sept. 9, 1987.

were Julian W. Dority and Wellington M. Manning, Dority & Manning, Greenville, S.C.

Charles B. Park, III, Bell, Seltzer, Park & Gibson, Charlotte, N.C., argued for appellees. With him on the brief were Michael D. McCoy, Kenneth D. Sibley and Dickson M. Lupo. Also on the brief was Fletcher C. Mann, Sr., Leatherwood, Walker, Todd & Mann, Greenville, S.C.

Before BALDWIN[*] and SKELTON, Senior Circuit Judges, and ARCHER, Circuit Judge.

BALDWIN, Senior Circuit Judge.

This is a consolidation of appeals from two judgments of the United States District Court for the District of South Carolina (district court) (1) declaring U.S. Patent No. 4,059,946 (the '946 patent) and U.S. Patent No. 4,175,370 (the '370 patent) valid and infringed and awarding increased damages and attorney fees based on a finding of willful infringement of the '946 patent and (2) granting a motion to enjoin subsequent infringement by a redesign of the accused device. Appeal was taken on four questions related to the district court's infringement determinations. We affirm the district court's decision with respect to each of the four questions on infringement.

### Background

In 1983, the three appellees in this appeal, Hans Stahlecker, Fritz Stahlecker, and Spindelfabrik Suessen-Schurr, Stahlecker and Grill GmbH (collectively and individually "Suessen"), brought an action in the district court for infringement of two patents[1] relating to improvements in the technology of open-end spinning devices, the '946 patent and the '370 patent. It was charged that an open-end spinning device, the Spincomat, produced and marketed by appellants, Schubert and Salzer Maschinenfabrik Aktiengesellschaft and Schubert and Salzer Machine Works, Inc. (collectively

James F. Davis, Howrey & Simon, Washington, D.C., argued for appellants. With him on the brief were Alan M. Grimaldi and Barbara A. Friedman. Also on the brief

---

[*] The Honorable Phillip B. Baldwin assumed Senior Circuit Judge status effective November 25, 1986.

1. Hans Stahlecker and Fritz Stahlecker are individuals who jointly owned the patents. Spindelfabrik Suessen-Schurr, Stahlecker and Grill, GmbH, a West German corporation, is an exclusive licensee of Hans and Fritz Stahlecker.

and individually "Schubert"),[2] infringes claim 18 of the '946 patent and infringes claims 1–7, 9–13, and 17–20 of the '370 patent. The district court rejected the Schubert defenses of invalidity, unenforce-ability, non-infringement, and implied license, and on September 4, 1985, issued its "Order and Opinion Including Findings of Fact and Conclusions of Law" declaring the '946 and '370 patents valid and infring-ed. The district court awarded increased damages based on willful and deliberate infringement and attorney fees under 35 U.S.C. § 285 (1982) for infringement attrib-utable to the '946 patent.

Six weeks later, on October 28, 1985, the district court issued an order declaring that, despite Schubert's efforts to produce a non-infringing modification, the rede-signed version of the Spincomat also in-fringes the '946 patent.

## A. *Standard of Review*

We review the four questions raised on appeal, each related to the district court's infringement determinations: (1) whether the district court properly rejected an im-plied license defense to infringement of the '946 patent; (2) whether there is clear error in the finding of infringement of the '946 patent by the redesigned Spinco-mat; (3) whether there is clear error in the finding of infringement of the '370 patent by the Spincomat; and (4) whether there is error or an abuse of discretion in the award of increased damages and attorney fees.[3]

2. Appellant Schubert and Salzer Maschinenfa-brik Aktiengesellschaft is a West German corpo-ration. Appellant Schubert and Salzer Machine Works, Inc., is a United States subsidiary of Schubert and Salzer Maschinenfabrik Aktienge-sellschaft.

3. The district court's determinations on validity, enforceability and certain assertions of non-in-fringement are not contested on appeal. Ac-

In conducting our review, we have the benefit of the district court's order. Its factual findings are to be reversed only if clearly erroneous. Fed.R.Civ.P. 52(a). A finding is clearly erroneous when, although there is evidence to support it, the review-ing court on the entire evidence is left with the definite and firm conviction that a mis-take has been committed. *Anderson v. City of Bessemer City*, 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985); *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948).[4] "This standard plainly does not entitle a reviewing court to re-verse the finding of the trier of fact simply because it is convinced that it would have decided the case differently." *Anderson*, 470 U.S. at 574, 105 S.Ct. at 1512.

Where the issue before us is a question of law, our review is based on whether the district court erred as matter of law. *Bandag, Inc. v. Gerrard Tire Co.*, 704 F.2d 1578, 217 USPQ 977 (Fed.Cir.1983); *Deere & Co. v. Int'l Harvester Co.*, 710 F.2d 1551, 218 USPQ 481 (Fed.Cir.1983).

## B. *The Technology*

The '946 and '370 patents are directed to the automation of open-end spinning (OES), a technology whereby uniformly twisted yarn is produced from irregular strands of fiber. The findings of the district court regarding OES technology and operation of an OES device are not contested.

cordingly, we have not reviewed the district court's findings with respect to those issues.

4. Notwithstanding Schubert's attack on the dis-trict court for its verbatim adoption of Suessen's findings, our review of those findings is gov-erned by the clearly erroneous standard. *Pen-tec, Inc. v. Graphic Controls Corp.*, 776 F.2d 309, 313, 227 USPQ 766, 768 (Fed.Cir.1985).

Yarn to Winder

SPINNING ROTOR DRIVE

YARN WITHDRAWAL TUBE

ROTOR

FIBER FEED TUBE

TWIST

Fiber Flow

FEED ROLL

Sliver Input

COMBER ROLL

TRASH TO WASTE

COMBER ROLL DRIVE

Above is a diagram of the principal elements of an OES device. Open-end spinning is performed on such a device in a sequence of steps. First, a mass of irregular strands of fiber is fed into the device on a feed roll. The feed roll, in turn, feeds fiber into a high speed, rotating, toothed comber where the fibers are separated into individual strands. The individual strands are then vacuum drawn into a rotor which is cup-shaped with an annular groove. A twist is imparted to the strands while they are under the centrifugal force of the high speed rotor. Once twisted, the strands become the final product, spun yarn. The yarn is pulled from the rotor through a withdrawal tube and wound onto a spool.

The '370 and '946 patents relate to a portion of the OES operation denoted as the "piecing point." As the yarn is withdrawn from the rotor, pulled by a pair of "take off" rolls and wound onto a spool, it is subject to breakage. Breakage inherently results in discontinuity in the operation, requiring reconnection and restarting of the operation. Automation of an OES de-

vice involves the implementation of a sequence of automatic steps to restart the device by cleaning out broken fiber, feeding new fiber into the rotor and reconnecting the newly spun yarn. The points of reconnection after breakage are denoted as "piecing points." Both of the patents in issue disclose improvements which avoid time lapse for reconnection and minimize nonuniformities in the yarn at the piecing points.

### I. Infringement of the '946 Patent

The '946 patent, entitled "Method and Apparatus for Start Spinning a Thread on Open-End Spinning Units" issued on November 29, 1977 to Dieter Boettcher, Heinze Schulz and Fritz Stahlecker. Hans and Fritz Stahlecker were subsequently assigned the patent, and they licensed Suessen as an exclusive licensee.

The '946 patent addresses the absence in the prior art of a method and apparatus for providing precise control of fiber feed during piecing. Claim 18 [5] recites an apparat-

5. Claim 18 is dependent upon claim 17. Claims 17 and 18 read as follows:
 17. Apparatus for thread piecing in an open-end spinning assembly comprising:
 opening means for opening sliver being supplied to a spinning rotor of said spinning assembly,

feeding means for feeding sliver to said fiber opening means,
piecing means including means for introducing a thread end back into said spinning rotor to be pieced together with a fiber ring formed in said spinning rotor,

us for performing a controlled sequence of steps for automated restart of the spinning operation, including preparation of the rotor.

The district court found that claim 18 of the '946 patent reads directly on Schubert's OES device, the Spincomat.[6] In making this finding, the court identified an aspect of the Spincomat which corresponds to each of the elements recited in claim 18. Literal reading of the '946 patent upon Schubert's Spincomat is not contested in this appeal.

### A. *The Implied License Defense*

Schubert argues that it has an implied license under the '946 patent. Its argument involves two agreements.

The first was a license agreement entered in 1982 between Schubert and Murata Machinery, Ltd. (Murata). That agreement, entered into before the filing of this suit in 1983, in pertinent part reads:

> Murata hereby grants to Licensee [Schubert] a non-exclusive worldwide license under the Patents to make, use and sell the patented device only as part of the open end spinning machines of the License. The License hereby granted is a limited license, and Murata reserves all rights not expressly granted.

The "Patents" were defined by the agreement as those listed in an Exhibit. They include U.S. Patent No. 4,022,011 ('011 patent) and other patents belonging to Murata in the name of Hironorai Hirai. Schubert asserts that, notwithstanding any infringement of '946, its accused infringement is merely a practicing of the '011 invention, which it is licensed to do under the 1982 agreement.

The second agreement, entered in 1984 after this lawsuit began, involved Suessen's purchase of the '011 and other Hirai patents from Murata. The agreement reads, in pertinent part:

> Suessen has been advised by Murata that a non-exclusive license of the patents and patent applications mentioned under 1. above had been granted by Murata to Messrs. Schubert & Salzer AG, Ingolstadt, F.R. Germany (hereinafter called the Licensee). Suessen hereby agrees to purchase the patents and patent applications mentioned under 1. above together with the License Agreement as of 23rd/28th July, 1982, with the said Licensee and agrees that you and your business/license concerns will maintain the licensed rights of the Licensee under the License Agreement as stipulated during the life of the patents and patent applications mentioned under 1. above.[7]

Schubert asserts that, per the 1984 agreement, Suessen "stepped in the shoes of Murata" and by so "stepping," Suessen cannot—just as Murata cannot—sue under the '946 or any other patent for infringement based on practicing the '011 invention. To allow such a suit, Schubert argues, would unfairly take away what it

---

rotor control means for moving said spinning rotor from a stop condition toward an operating spinning speed to accommodate piecing by said piecing means,
and fiber supply preparing means for preparing said spinning assembly for a piecing operation prior to movement of said spinning rotor from its stopped position, said fiber supply preparing means including means for starting and operating said feeding means for a period of time and then stopping said feeding means, said starting and stopping being accompanied by a continuously operating opening means, whereby uniform fiber tufts are arranged at said sliver feeding means to accommodate said piecing operation to be subsequently performed.
18. Apparatus according to claim 17, further comprising means for supplying a vacuum to said spinning rotor to remove any fiber supplied during said preparation of said spinning assembly by said preparing means.

6. In addition to rejecting the implied license defense, the district court rejected Schubert's argument that the absence in their device of a "rotor control means" and "piecing on the rise" avoided infringement. Only the implied license defense has been appealed.

7. Another part of the agreement refers to "the assignment of the [1982] License Agreement." The 1982 license, however, states that it is "nontransferable, nonassignable." Our disposition of this case assumes, *arguendo*, that there was a transfer of the 1982 license agreement which did not violate the terms of that agreement.

paid for in 1982. Schubert labels its argument one of "legal estoppel."

The district court concluded that Schubert in 1982 could not have acquired from Murata any rights greater than those which Murata had the right to grant and that Murata had nothing more than a right to exclude others from using the Hirai patents. It then concluded, regarding the 1984 agreement:

There is nothing whatsoever in this agreement about the '946 patent, any patent corresponding to the '946 patent, or any technology specifically covered by those patents. Nor is there any language in the agreement that can be construed as a grant by Suessen of any right to practice any particular technology which might be covered by other Suessen patent rights. All this agreement does is to convey to Suessen the entire right, title and interest in all of the Hirai patents, with the express reservation to the effect that a nonexclusive license under these Hirai patents had already been granted by Murata to [Schubert], and with the express acknowledgment by Suessen that it would continue to recognize the existence of that license under the Hirai patents. While this latter acknowledgment might seem redundant from the viewpoint of the law in this country (whereby a patent assignee under normal circumstances would be bound as a matter of law by its assignor's prior grant to a license to a third party), it served a clear purpose under German law since, as referred to above [pp. 23–24, *supra*], the German High Court had recently handed down a ruling, the effect of which was that an existing nonexclusive right under a German patent could be defeated by an assignment of the patent by the owner to a third party.

The net effect of the 1984 agreement, said the district court, was that Schubert is "the beneficiary of a guarantee by Suessen that the nonexclusive rights under the Hirai patents granted to [Schubert] by Murata in 1982 could not be taken away by the new patent owner, Suessen" and that the enforcement of the '946 patent against Schubert in this litigation "in no way affects that guarantee."

The district court then added:

Beyond these two agreements, defendants offered no further evidence in support of the existence of any implied license—not even the testimony of defendants to the effect that they ever even thought they might have an implied license or that they were led to take or ever took any action upon reliance that they had rights under the '946 patents.

In the latter regard, the district court cited *Bandag, Inc. v. Al Bolser's Tire Stores, Inc.*, 750 F.2d 903, 925, 223 USPQ 982, 998 (Fed.Cir.1984), and *Stickle v. Heublein, Inc.*, 716 F.2d 1550, 1559, 219 USPQ 377, 383 (Fed.Cir.1983), where this court discussed implied license in the context of equitable estoppel. The district court concluded that equitable estoppel could not be a basis for implied license in this case.

### Discussion

The doctrines of legal estoppel and equitable estoppel have been applied by courts to imply a license. *See, e.g., AMP, Inc. v. United States*, 389 F.2d 448, 452, 182 Ct.Cl. 86, 156 USPQ 647, 649–50 (1968), *cert. denied*, 391 U.S. 964, 88 S.Ct. 2033, 20 L.Ed.2d 878 157 USPQ 720 (1968). Under the facts of this case, there can be no implied license under an equitable estoppel theory. Indeed, that theory is not even argued by Schubert. Instead, Schubert asserts an implied license based on its theory of legal estoppel. Though we recognize that theory in appropriate circumstances, it does not work for Schubert here.

Legal estoppel "is merely shorthand for saying that a grantor of a property right or interest cannot derogate from the right granted by his own subsequent acts." *AMP v. United States*, 389 F.2d at 453, 156 USPQ at 650–51. The rationale for that is to estop the grantor from taking back that for which he received consideration, 389 F.2d at 452, 156 USPQ at 649–50. Here, however, we have a suit by a third party, Suessen, under a patent owned by Suessen. The license by the grantor, Murata, did not purport to, and indeed could not, protect

Schubert from a suit by Suessen under '946. Hence, Suessen, by filing in 1983 and now maintaining its suit under '946, does not derogate from the right given by Murata in the 1982 license agreement.

Schubert nevertheless urges this three prong argument: (1) "legal estoppel" would prevent *Murata* from suing under the '946 patent if it were to acquire it; (2) Suessen "stepped into" Murata's shoes in 1984 when Suessen acquired the Hirai patents and committed to maintain Schubert's licensed rights; and hence, (3) just as Murata could not, Suessen cannot sue under the '946 patent. We reject that argument.

 As a threshold matter, a patent license agreement is in essence nothing more than a promise by the licensor not to sue the licensee. *See, e.g., United States v. Studiengesellschaft Kohle, m.b.H.*, 670 F.2d 1122, 1127, 212 USPQ 889, 894 (D.C. Cir.1981). Even if couched in terms of "[l]icensee is given the right to make, use, or sell X," the agreement cannot convey that absolute right because not even the patentee of X is given that right. His right is merely one to exclude others from making, using or selling X, 35 U.S.C. § 154. Indeed, the patentee of X and his licensee, when making, using, or selling X, can be subject to suit under other patents. In any event, patent license agreements can be written to convey different scopes of promises not to sue, *e.g.,* a promise not to sue under a specific patent or, more broadly, a promise not to sue under any patent the licensor now has or may acquire in the future.

 As stated previously, the first prong of Schubert's three part "stepping in the shoes" argument is that legal estoppel would prevent Murata from suing Schubert under the '946 patent if Murata were to acquire that patent. However, even as-suming, *arguendo*, that such estoppel against Murata exists, the final two prongs of Schubert's "stepping in the shoes" argument would fail. Given the assumption of estoppel against Murata, the 1982 license agreement would necessarily be a promise by Murata not to sue under any patent, including those acquired by Murata in the future.[8] In the 1984 agreement, Suessen incurred what Murata promised in 1982. Thus, Suessen would be committed to fore-bear from suit under (1) the transferred patents and (2) any of Murata's nontransferred patents (future and present).[9] That commitment does not include a promise not to sue under Suessen's own '946 patent.

Schubert's "standing in the shoes" argument, however, would add to Suessen's commitment a promise not to sue under Suessen's separate patents that Murata never owned. On the facts of this case, we cannot interpret the 1984 agreement so broadly, at least not with respect to the '946 patent.

The district court correctly determined that there is nothing in the 1984 agreement about the '946 or other Suessen patent rights. Schubert points to no extraneous evidence tending to show any under-standing on the part of either contracting party that Suessen was to forego rights under the '946 or any other patent then owned by Suessen. To the contrary, that a lawsuit under '946 was ongoing but not mentioned in the 1984 agreement indicates strongly that there was no intent by the

8. Given such a promise, a subsequent suit by Murata under a hypothetically-acquired '946 patent would derogate from what was granted by the license. Conversely, if the agreement were merely a promise not to sue under the listed patents only, there could be no estoppel against Murata asserting the '946 patent.

9. Regarding the second promise, because Sues-sen cannot normally sue under patents remain-ing in Murata's hands, a promise not to sue under such patents has no realistic effect. Hence, the second promise would have signifi-cance only for Murata patents not transferred in the 1982 agreement but acquired by Suessen from Murata in the future. Though the district court construed the 1984 agreement as contain-ing only the first promise, which pertains to the patents transferred with the 1982 agreement, that construction makes sense in light of its initial holding that the 1982 agreement pertains only to those patents. Our construction of the 1984 agreement as containing a second promise arises from our assumption, *arguendo*, that the 1982 agreement pertains also to Murata patents not transferred with the 1982 agreement.

parties to have Suessen forfeit its rights under '946. Furthermore, an implied promise by Suessen to forego its '946 suit is inconsistent not only with Suessen maintaining its lawsuit after the 1984 agreement but, also, with the course of events leading up to the 1984 contract.[10] In sum, we agree with the district court's conclusion that the 1984 agreement did not impose on Suessen any obligation to stop its ongoing suit under the '946 patent.

Schubert cites no case discussing its "standing in the shoes" theory. It does, however, rely on *Kearney & Trecker Corp. v. Giddings & Lewis Mach. Tool Co.*, 285 F.Supp. 483, 159 USPQ 433 (E.D.Wis.1968). There, plaintiff sued defendant under a "Brainard patent." Plaintiff also owned a "Morgan patent," which was assigned to it by a third party subject to a previous license to the defendant. In the context of denying a summary judgment motion, the district court discussed a need at trial to focus on whether the claims of the Brainard patent had "separate features" from the Morgan claims. However, the court did not specifically address the issue discussed herein, i.e., whether the assignment to plaintiff of the patent subject to a license to the defendant affected plaintiff's suit against defendant under its separately-owned patent.[11] In any event, *Kearney* is not binding precedent on this court.

Schubert argues that not implying a license in this case is unfair because Schubert paid valuable consideration for the right to practice the '011 invention but is in danger of losing that right as a result of doing no more than that for which it paid. We disagree. The right Schubert paid for

in the 1982 agreement was freedom from suit by Murata, not Suessen. Indeed, when Schubert signed the 1982 agreement, it was aware of possible suit by Suessen, who had previously denied Schubert a license under the '946 patent. Moreover, Schubert has not shown us that it has lost any obligation Murata may still owe it under the 1982 license agreement, *e.g.*, not to sue under any patents Murata still has or may acquire. To rule that the Suessen acquisition of the '011 patent somehow bestows on Schubert an absolute defense to a suit already filed by Suessen under '946, would result in an unintended windfall to Schubert that makes no sense under the facts of this case.

## B. *Infringement Of The '946 Patent By The Redesigned Spincomat*

On October 16, 1985, Suessen filed an Emergency Motion for an Order requesting the district court to enjoin Schubert from infringing claim 18 of the '946 patent by exhibiting and demonstrating at the Textile Hall in Greenville, South Carolina, a modified, but allegedly still infringing Spincomat. The district court determined that despite Schubert's attempts, this modification does not avoid infringement of the '946 patent.[12]

Schubert had disengaged electrical relays in order to interrupt control of the prefeed in the piecing cycle. As modified, the sliver is prefed for a short period of time prior to commencing piecing. Schubert contended that the disengagement of relays altered control of advance piecing so that the device no longer performs the recited function of a fiber preparation means.

---

10. For example, the invention of Suessen's '946 patent had a dynamic commercial impact since its public unveiling in 1975. As early as 1974, Suessen discussed its new technology with Schubert. Schubert tried to develop a comparable version of Suessen's advancement but was unsuccessful. Eventually, around June, 1982, Schubert requested a license from Suessen but was refused. Three weeks later, Schubert obtained a license under the '011 and other Hirai patents. Subsequently, this lawsuit was filed. Those facts show a great value placed by Suessen on its '946 patent and an unwillingness to license it to Schubert.

11. On that issue, we note that the assignment of the Morgan patent in *Kearney* seems to have occurred *before* plaintiff filed suit under its Brainard patent. In this case, as expressed above, the assignment of the '011 patent was made *after* Suessen filed suit under '946, a fact which cuts against interpreting the assignment as foreclosing the suit.

12. The district court issued two orders enjoining activity related to infringement by the redesigned Spincomat. One issued on October 23, 1985 enjoining the infringing activity. A second order, with findings, issued on December 24, 1985, denying a motion to stay the first order.

Suessen countered with a video tape showing that despite the reprogramming to omit the sliver prefed from the start of the piecing sequence, if the piecer is unsuccessful on the first try (without a sliver prefed) it would call for a "repeat," second try with a prefeed. The district court compared the "repeat" piecing sequence with claim 18 and determined that it functions in precisely the same sequence to accomplish piecing just as had the original Spincomat and thus employed the same fiber supply preparation means called for in the '946 patent.

The instant "fiber supply preparing means" is the mechanism for prefeed of the lead end of the sliver. It was determined that the Spincomat continued to perform the function specified in the claim limitation. Although modified, the device, in accord with the recitation in claim 18, has a means for preparing the spinning assembly including a mechanism for starting and operating the feeding means for a period of time and then stopping the feeding means. This, the court found, corresponds exactly to the function of "fiber supply preparation means" recited in claim 18.

Schubert argues that the device is not infringing because it would have to fail each time in order to have an infringing prefeed. Otherwise, it is argued, the modified device merely operates under the prior art.

We agree, however, with the district court that claim 18 continues to read upon the device. We find no error and affirm the district court's order of January 2, 1986, directing that Schubert cease manufacture, sale or use of the redesigned Spincomat.

C. *The District Court's Award Of Increased Damages And Attorneys' Fees Based On A Finding Of Willful And Deliberate Infringement And Exceptional Circumstances*

The district court found infringement of the '946 patent by the original Spincomat to be willful and deliberate based upon two determinations: (1) that Schubert fully appreciated the great commercial significance of Suessen's apparatus and Schubert spent six or more years trying to engineer its own version, and (2) that Schubert fully appreciated the significance of the technological aspects of the improvement over the prior art represented by the '946 patent and its key role in the commercial success of the device. Based on the finding of willfulness the court imposed an award of increased damages under 35 U.S.C. § 284 as to the '946 patent infringement portion of the case. Upon those same determinations the court adjudged this as an exceptional case of infringement and awarded attorney's fees under 35 U.S.C. § 285 for the portion of the case related to infringement of the '946 patent.

The underlying facts are undisputed. The question before us is whether the ultimate finding of willful infringement is clearly erroneous in light of those underlying facts and whether the award of increased damages and attorney's fees was an abuse of discretion by the district court. *Kloster Speedsteel, AB v. Crucible, Inc.,* 793 F.2d 1565, 1580–81, 230 USPQ 81, 91 (Fed.Cir.1986), *cert. denied,* — U.S. —, 107 S.Ct. 882, 93 L.Ed.2d 836 (1987); *Reactive Metals and Alloys Corp. v. ESM, Inc.,* 769 F.2d 1578, 1582–83, 226 USPQ 821, 824 (Fed.Cir.1985).

Schubert argues clear error in the trial court's findings of willful infringement and exceptional circumstances, contending that reasonable reliance upon the advice of their German in-house counsel, that bona fide attempts to design around the patent, and the seeking of a license support a conclusion of non-willful infringement.

A district court's finding of willful infringement is a finding of fact, reviewable under the clearly erroneous standard. *CPG Products Corp. v. Pegasus Luggage Inc.,* 776 F.2d 1007, 1015, 227 USPQ 497, 502 (Fed.Cir.1985). As noted earlier, the clearly erroneous standard is satisfied if we are left with the firm conviction that a mistake has been committed. *Anderson v. City of Bessemer City,* 470 U.S. at 564, 105 S.Ct. 1504. When increased damages are awarded under 35 U.S.C. § 284, the measure of those damages is committed to the

district court's discretion, the exercise of which will not be overturned absent a clear showing of abuse. *CPG Products*, 776 F.2d at 1015 n. 6, 227 USPQ at 502 n. 6.

■ It is well settled that a potential infringer having actual notice of another's patent rights has an affirmative duty of due care. That affirmative duty will normally entail the obtaining of competent legal advice before engaging in any potentially infringing activity or continuing such activity. In *Underwater Devices, Inc. v. Morrison-Knudsen Co., Inc.*, 717 F.2d 1380, 1389–90, 219 USPQ 569, 576 (emphasis in original), this court stated:

> Where, as here, a potential infringer has actual notice of another's patent rights, he has an affirmative duty to exercise due care to determine whether or not he is infringing. * * * Such an affirmative duty includes, inter alia, the duty to seek and obtain competent legal advice from counsel *before* the initiation of any possible infringing activity.

■ Schubert did not obtain the advice of the United States counsel regarding the possibility of infringement of the '946 patent, but proceeded upon the opinion of German in-house patent counsel that making, using and selling in the United States the Spincomat piecing mechanism would be legitimate under the '011 patent license. However, reliance on the advice of counsel is not determinative in this case.[13]

■ An appreciation of the technological and commercial significance of Suessen's rights, despite legitimate practice under the '011 patent, put Schubert on notice to exercise due care prior to initiating any activity which had the possibility of infringing. Before obtaining the license under the '011 patent, Schubert attempted unsuccessfully to obtain a license to

the '946 patent from Suessen. Suessen's denial of a license to Schubert supports a conclusion that Schubert was explicitly aware of the possibility of infringement. Under those circumstances, Schubert must be held to a high degree of caution to avoid the possibility of infringement of the '946 patent. *Underwater Devices*, 717 F.2d at 1389–90, 219 USPQ at 576.

We have noted a good faith effort to "design around" as indicating support for a non-willful finding. *Rolls Royce Ltd. v. GTE Valeron Corp.*, 800 F.2d at 1109, 231 USPQ at 191. We have also indicated value in encouraging such efforts. *State Industries, Inc. v. A.O. Smith Corp.*, 751 F.2d 1226, 1236, 224 USPQ 418, 424 (Fed. Cir.1985). The district court did not, however, find that Schubert had exerted good faith efforts to design around the '946 patent. Rather, it was found that Schubert, unable to design its own automatic piecing device, knowingly proceeded to employ technology protected under the '946 patent.

The willful and deliberate nature of Schubert's infringement is not diminished by its asserted defense of implied license. The facts related to that assertion arose in the 1984 assignment of the '011 patent to Suessen, long after Schubert willfully initiated the acts of infringement. Accordingly, the district court properly omitted consideration of the defense of implied license as negating a finding of willfulness.

Having considered the findings of the district court and all of the arguments presented on appeal, we find no clear error in the district court's determination that infringement of the '946 patent was willful and deliberate. Nor do we find the imposition of increased damages under 35 U.S.C. § 284 or the award of attorney fees under 35 U.S.C. § 285 abusive of the district

---

**13.** Furthermore in respect of willfulness, there cannot be hard and fast *per se* rules. *Rolls Royce Ltd. v. GTE Valeron Corp.*, 800 F.2d 1101, 1109, 231 USPQ 185, 191 (Fed.Cir.1986). Though it is an important consideration, not every failure to seek an opinion of competent counsel will mandate an ultimate finding of willfulness. *Kloster Speedsteel, AB v. Crucible, Inc.*, 793 F.2d at 1579, 230 USPQ at 88. *See also King Instrument Corp. v. Otari Corp.*, 767 F.2d

853, 867, 226 USPQ 402, 412 (Fed.Cir.1985), *cert. denied*, 475 U.S. 1016, 106 S.Ct. 1197, 89 L.Ed.2d 312 (1986). Conversely, that an opinion of counsel was obtained does not "always and alone" dictate a finding that the infringement was not willful. *Kori Corp. v. Wilco Marsh Buggies and Draglines, Inc.*, 761 F.2d 649, 656, 225 USPQ 985, 989 (Fed.Cir.), *cert. denied*, 474 U.S. 902, 106 S.Ct. 230, 88 L.Ed.2d 229 (1985).

court's discretion. Where a finding of willful and deliberate infringement and a collateral finding of exceptional circumstances are premised on the same basis, this court has found no abuse of discretion in awarding both increased damages and attorney fees. *S.C. Johnson & Son, Inc. v. Carter-Wallace, Inc.*, 781 F.2d 198, 201, 228 USPQ 367, 368 (Fed.Cir.1986). Accordingly, we affirm the district court's awards.

## II. *Infringement Of The '370 Patent*

■ The '370 patent, entitled "Piecing Apparatus For An Open-End Spinning Machine," issued on November 27, 1979 in the name of Fritz Stahlecker and was assigned to Hans and Fritz Stahlecker. It was licensed to Suessen. The invention disclosed in the '370 patent is directed to the solution of a specific problem encountered during the automatic piecing cycle: the maintenance of tension in the yarn drawn off from the rotor during the piecing operation. The '370 patent discloses an apparatus with means of maintaining control while winding the yarn so that loops or slippage do not occur. The apparatus prevents slippage between the yarn winding package and the drive roll used to accelerate the yarn through a means of path control. A yarn path deflector is also employed to deflect any slack which may occur in the yarn.

The claim recitation of an "auxiliary driven feed means" element is the focus of this appeal:

> auxiliary yarn guide means for guiding the yarn between the spool and a yarn outlet of a spinning rotor of the spinning assembly during piecing operations, said auxiliary yarn guide means including auxiliary driven feed means for said yarn.

A finding of literal infringement of a claim expressed in terms of a series of means for performing particular functions required involves interpreting the claim to define the recited function. If, as a threshold matter, the recited functions are not performed by the accused device, there can be no literal infringement. On the other hand, if an accused device is found to perform the recited functions, one must determine under § 112 para. 6 whether the means by which the accused device performs each function is the same as or equivalent to the means disclosed in the specification for performing each function. *See Data Line Corp. v. Micro Technologies, Inc.*, 813 F.2d 1196, 1201, 1 USPQ2d 2052, 2055 (Fed.Cir.1987). As held in *D.M.I. v. Deere & Co.*, 755 F.2d 1570, 1575, 225 USPQ 236, 239 (Fed.Cir.1985):

> In applying the "means plus function" paragraph of § 112, however, the sole question is whether the single means in the accused device which performs the function stated in the claim is the same as or an equivalent of the corresponding structure described in the patentee's specification as performing that function.

In holding that the Spincomat literally infringes the claims [14] of the '370 patent the district court found under § 112, para. 6, that it included an auxiliary driven feed "means," to perform the function of guiding and drawing off the yarn. It was determined that the Spincomat's fixed and movable pressure rolls are the means which perform the precise function of feeding yarn by an auxiliary drive.

The Spincomat's rolls were determined to be equivalent to the "auxiliary driven feed means" disclosed in the specification. In one sense the Spincomat rolls are not auxiliary, they are located on the spinning machine. During spinning the rolls guide yarn between the rotor and the spool. But, during a piecing operation, those rolls are "borrowed" as auxiliary rolls to perform exactly the recited function of drawing the yarn out of the withdrawal tube, feeding it into the yarn package, and guiding the yarn between the spool and the yarn outlet. It was determined that the borrowed rolls in their auxiliary mode are a structural means equivalent to that disclosed in the

---

**14.** Schubert is accused of infringing claims 1–7, 9–13, and 17–20 of the '370 patent, each requiring an "auxiliary driven feed means."

specification. *See D.M.I. v. Deere & Co.*, 755 F.2d at 1575, 229 USPQ at 239.

Having reviewed the arguments raised on appeal, we find no clear error by the district court and affirm the finding of literal infringement of the '370 patent.

### Conclusion

We affirm the decision of the district court finding infringement by the original Spincomat of the '946 and '370 patents and finding infringement of the '946 patent by the modified Spincomat. The awards of increased damages and attorney fees based on findings of willful infringement and exceptional circumstances are sustained.

AFFIRMED