**PRC REALTY SYSTEMS, INC., Plaintiff,**

v.

**NATIONAL ASSOCIATION OF REALTORS, INC., Defendant.**

**Civ. A. No. 90–1287–A.**

United States District Court, E.D. Virginia, Alexandria Division.

May 13, 1991.

---

Michael C. Elmer, John Hornick, Finnegan, Henderson, Farabow, Garrett & Dunner, Washington, D.C., for plaintiff.

David D. Hudgins, Hudgins, Carter & Coleman, Alexandria, Va., for defendant.

## MEMORANDUM OPINION

BRYAN, Chief Judge.

At issue in this case is the right to create and market book publishing software for books which contain multiple listing of houses and other real property for use by local Boards of Realtors and multiple listing services throughout the United States. These multiple listing service (MLS) books are produced weekly or bi-weekly and contain information concerning the properties which are used by agents and realtors in promoting sales.

Prior to the controversy which spawned this litigation, the plaintiff, PRC Realty Systems, Inc. (PRC), through its predeces-

sor, Multi–List, Inc., marketed, and indeed still markets, a product which it refers to as a CASH [1] on-line system.[2] This is a collection of computer software programs with the capacity to store, manipulate, search, maintain and utilize multiple listing information about real estate which is for sale, e.g., number of bedrooms, square feet, and price. The system provides users, in this case Boards of Realtors and others who are members of the defendant National Association of Realtors (NAR),[3] with the capability to search and extract data based on various criteria, e.g., all properties in a particular area with access to waterfront.

At the time the system was first licensed or delivered to NAR, it allowed a member of NAR to store and manipulate multiple listing property information on a computer database that could be accessed by individual real estate agents and brokers in their own offices. The only form in which a user could get the information, absent access to the published form at issue in this case, was to view it on a screen, and perhaps to print a copy obtained from that screen.

PRC also markets an MLS book publishing operation at its own plants using data supplied by Boards of Realtors and multiple listing services. These publications, as stated earlier, are weekly or bi-weekly issues, which bring up to date the additions to and deletions of properties included in the previous publication's listing. The publishing aspect of PRC's operation is where the profit is. The publishing of MLS books by PRC and its predecessor, Multi–List, Inc., is accomplished by way of electronic interface, over telephone lines, from databases located on the premises of the Boards of Realtors and multiple listing services. Data is extracted from the various database systems and transmitted to PRC publishing plants around the country where pre-press composition functions and printing of camera-ready copy functions are performed to publish MLS books. These services are referred to as "traditional" or "interface" book publishing.

On October 31, 1984, Multi–List and NAR entered into an agreement entitled "License and Wholesale Agency Agreement." Under this agreement, Multi–List granted NAR an exclusive license for five years to use and sublicense the CASH system. The agreement provided that NAR should not use the name "CASH Software" in its marketing and sublicensing efforts, but should use a different name; the name used was "RCS/MLS." It further provided that, although NAR was not required to promote the publishing services (Book Service Contracts) of Multi–List, NAR would not market the publishing services of any other vendor during the five year period. As an incentive to NAR's marketing of the Book Service Contracts, the license fee for the use of the CASH system was reduced or eliminated if NAR delivered such contracts for its members.

On January 30, 1985, NAR and Multi–List entered into a "Software Conversion and License Agreement" whereby Multi–List agreed to convert the CASH system software from the PDP computer so that it would execute on VAX hardware. The terms of the 1984 license agreement were incorporated into the 1985 agreement.

The source code for the CASH system, a series of instructions actually written by computer programmers, is to be distinguished from the object code, which are the

---

**1.** CASH stands for "Computer Aided Search for Homes."

**2.** The company that produces one of the products at issue in this case has gone through a number of transformations. The CASH computer software system was originally developed by a company known as Multi–List, Inc., in the 1970's. At that time, Multi–List, Inc., was owned by McGraw–Hill Corporation. In 1984, Multi–List, Inc., was purchased by REDI Corporation. It was in 1984 that the first of the license agreements between the parties was signed. On February 28, 1986, Multi–List, Inc., was purchased by Realtron Corporation. On November 5, 1987, Realtron sold Multi–List, Inc., to PRC. On July 31, 1990, Multi–List, Inc., was merged into PRC.

**3.** NAR, a not-for-profit corporation, is the largest trade association in the United States. It has 800,000 members, consisting of realtors, realtor associates, and approximately 1900 boards.

instructions that the computer actually executes. The object codes, i.e., executable versions, were delivered to NAR, but the source code was not, under either the 1984 or 1985 agreements.

On February 28, 1986, the same day Realtron purchased Multi–List, Multi–List and NAR entered into a "Termination Agreement." This agreement, aside from terminating the 1984 and 1985 agreements, accomplished some other things. It gave NAR a 30 year non-exclusive license to use and sublicense the software identified in Appendix A to the agreement, and it obligated NAR to use its best efforts to promote Multi–List's book publishing services. The paragraph which gives rise to this obligation, and which is the subject of much of the controversy in this action, read at the time of the execution of the Termination Agreement (the underlined portion was later amended) as follows:

8. Most FAVORED PRODUCER

*When a member Board or multiple listing service contracts with NAR for NAR's MLS book, NAR shall first request a quote from Multi–List for the production of these books before requesting a quote from any other producer.* In the event the terms offered by Multi–List for the book contract are acceptable to the Board or multiple listing service, and no other vendor offers a lower amount, NAR shall place the book order with Multi–List unless specifically requested by the Board or multiple listing service to place the book with another vendor. NAR shall, however, use its best efforts to convince a Board or multiple listing service to accept the quote and terms offered by Multi–List. Should another vendor offer a lower quote, Multi–List shall have the right to match such lower quote and should Multi–List exercise such right, NAR shall place the book order *with Multi–List unless specifically requested by the Board or multiple listing service to place the book order with another vendor.* NAR shall, however, use its best efforts to convince a Board

or multiple listing service to accept the quote and terms offered by Multi–List.

The agreement was beneficial to both parties. It gave NAR the source code, itself an unusual provision, and a 30 year period, renewable for an additional 30 years, during which it could do anything it wanted with the software, including modifications, except:

(a) Sublicense the software to a competitor of Multi–List;

(b) Use the name CASH Software (the named used by NAR was RCS/MLS); and

(c) Release the source code.

Multi–List, on the other hand, got the right to access the database for use in its own system,[4] and, better still, NAR's "best efforts" put Multi–List in a favorable position for marketing its publishing services through NAR's extensive and influential relationship with NAR's member Boards.

The Termination Agreement eliminated the language appointing NAR as "wholesale agent" for Book Services Contracts. The "best efforts" clause allowed NAR, at customers' requests, to place book orders with another vendor.

Although the interface programs, i.e., the programs which facilitate the communications between Multi–List's publishing plants and the databases at the Boards' sites, were delivered to NAR along with the source code, it is the position of PRC that these interface programs were not covered by the licensing provisions of the Termination Agreement of 1986.

The Termination Agreement was not assigned to any party as part of the numerous November 5, 1987 agreement. This was so because the parties to that agreement were NAR and Multi–List. Multi–List had 100% of its stock purchased by PRC. Thus Multi–List remained the effective party to the Termination Agreement.

On August 10, 1988, partly to reflect the interest of PRC as parent of a party to the Termination Agreement, and partly to re-

---

**4.** Indeed Multi–List is given the *exclusive* right to the database for generation of the book to be published by Multi–List.

flect the sequence in which quotes and contracts happened in the real world, the parties amended the first sentence of the Termination Agreement so that the first sentence read as follows:

> Whenever a member Board or Multiple Listing Service requests a quote from NAR to provide MLS Books, NAR shall request a quotation from PRC for the production of the requested products, such request being submitted to PRC no later than any request placed with other potential providers of such MLS Books.

The remainder of the Termination Agreement was to remain in full force; and indeed the parties thereafter treated it as being in full force. There can be no serious contention that NAR was not aware of the various corporate changes in ownership and commitments that had emerged as of November 5, 1987.

Around March, 1987, NAR began development of a product which it called "Book Plus." The concept of such a development may have been in NAR's mind as early as 1986. Taking advantage of advanced technology, this product uses the CASH system, which NAR asserts it has now enhanced practically beyond recognition and which it refers to (as required by the Termination Agreement) as its RCS/MLS system. With a "digitalized/video camera apparatus" the user of the system can produce "camera-ready" pages of MLS books "in-house." If produced with spaces left blank for photographic images, the pages are referred to as "near camera-ready." The ability to produce pages "in-house" enables users to contract directly with local printers for reproduction and binding of MLS books. This avoids, and according to NAR, renders obsolete, the "traditional" or computer interface stages between the offices of the Boards of Realtors and the printing plant necessary to effect the type of book publishing contemplated by the Termination Agreement. NAR is currently, and has been since August, 1988, marketing Book Plus to its member Boards, granting them licenses of twenty-five years. NAR and PRC are competitors for the same business, and of course NAR, as a not-for-profit corporation, has the competitive edge.

NAR characterizes its development of Book Plus as an enhancement or modification of the RCS/MLS system which it licensed from Multi–List under the Termination Agreement. PRC, on the other hand, asserts that this is a product that is a new "off-line" use of its "on-line" RCS/MLS system—one that is an "add on" to the RCS/MLS system and compatible only with that system. PRC also asserts that the Book Plus system competes with PRC's RCS/MLS system and that NAR's efforts in its marketing of Book Plus violates the "best efforts" requirements of the Termination Agreement.

PRC has recently filed Certificates of Copyright Registration. On June 28, 1990, a registration was filed under the heading "CASH CATALOG INTERFACE PROGRAM" (PX 187). On December 20, 1990, a registration was filed under the heading "CASH ON–LINE SYSTEM" (PX 186, 186A).

The complaint in this action was filed on September 21, 1990. It set forth six counts:

1. Breach of contract

2. Anticipatory breach of contract

3. Copyright infringement

4. Breach of duty of agent to principal

5. Breach of fiduciary duty

6. Intentional interference with existing and prospective business and contractual relationships.

Injunctive relief as well as damages, both compensatory and punitive, were sought. On January 4, 1991, the plaintiff was allowed to amend its complaint. No change of substance in the theories advanced in the counts as originally set forth was effected by the amendment.

The case was tried to the court on April 2–5, 1991. Decision was reserved to allow the parties to submit post trial briefs. They have now been received and considered.

### Breach of Contract[5]

The primary thrust of the breach of contract claim is addressed to the "best efforts" obligation on the part of NAR contained in Paragraph 8(a) of the Termination Agreement. The plaintiff asserts that the promotion and sale of Book Plus by NAR is inconsistent with and breaches this paragraph. The court agrees. The "best efforts" obligation of NAR was the primary if not sole consideration for the granting of the license to use and sublicense the system. What NAR has done, under the guise of "enhancing" the system licensed to it, is to "add on" to that system, create an off-line system for the sale and promotion of Book Plus, and go into direct competition with PRC.

Such direct competition is the very antithesis of best efforts. Read as a whole, it is apparent that the intention of the parties was that NAR would sell to its members its RCS/MLS on-line system and, as part of the package, attempt to sell the Multi–List MLS book publishing system. The only practical[6] exception to this scenario would be if NAR was specifically requested by a member to place the book with another vendor. That NAR misapprehended or chose to ignore the impact of its "best efforts" obligation is evidenced by its agreement with Realtron to use its, NAR's, best efforts for that entity. Indeed the "best efforts" clause in the Realtron agreement seems to be copied from that in Paragraph 8(a). The court rejects the interpretation of Paragraph 8(a) which imposes on NAR the obligation to do no more than present a quote to Multi–List and get a price if the member Board desired such a price.

Paragraph 2 of the Termination Agreement grants to NAR the non-exclusive license to, among other things, enhance the licensed software. The plaintiff asserts that this part of the Termination Agreement was also breached.

The court rejects the assertion by NAR that its development of Book Plus is no more than an enhancement, permitted by the Termination Agreement, of the system licensed to it by PRC. The term enhancement is not defined in the agreement and has no standard meaning in the industry; it is ambiguous. The court finds that the parties did not intend that the term include an "add on" to the CASH on-line system so as to embrace a new and different off-line book publishing system such as Book Plus. Albeit decried by NAR as being without a difference, the court finds there is a distinction between an "on-line" and "off-line" system. What existed before Book Plus was a system where members of NAR using the system sat at a computer terminal, viewed a computer screen, and searched the database by entering commands on a computer keyboard. Members using the system communicated with the database in a direct, live exposure to the data. Book Plus takes the data and arranges it into page form. There is no live viewing. What is involved in the creation of Book Plus is appropriately designated "off-line." What was licensed and what was permitted to be enhanced was the on-line system. Book Plus impermissibly exceeds that. Moreover, construing "enhance" to include Book Plus would render meaningless Paragraph 8(a).

In sum, Book Plus is a separate product, with a separate function and purpose. It is not merely an enhancement of the licensed software. Enhancement here can only mean improvements made to an on-line system, not to include a separately marketable product. Development and sale of Book Plus exceeded the license granted and thus

---

5. The court concludes that the claim for anticipatory breach of contract, as alleged in Count 2 of the complaint, is subsumed in the breach of contract count.

6. Actually, in light of the limited number of vendors capable of publishing MLS books through electronic interface for member Boards sublicensed by NAR to use the RCS/MLS system, the only vendor would almost have to be PRC. This is so because Realtron, which also had the technical capability, had entered into a noncompete agreement with PRC (PX 290). As part of the Termination Agreement, PRC had the exclusive right to use MLS data of the sublicensees for purposes of generating the MLS Books. Other vendors, therefore, could not properly use this data.

breached Paragraph 2 of the Termination Agreement.

The court finds that NAR breached the Termination Agreement in other respects:

■ First, in obligating itself to Realtron, on November 30, 1988, to use its best efforts to promote Realtron's book publishing services. No clearer breach of a "best efforts" obligation to one party could be shown than an almost identical obligation to another party.

■ Second, in granting to Offutt Publishing Company and to Realtron Publishing a *non-exclusive* right to use MLS data for purposes of generating the MLS book *after* having, in Appendix D, Paragraph (e) of the Termination Agreement, granted Multi–List the *exclusive* right to use that data for the same purpose. Although after the grant to Multi–List there was theoretically nothing left for NAR to grant to Offutt and Realtron, and technically the grants to those entities may be a nullity, nevertheless, the attempted grant by NAR is a breach.

Third, by copying pieces of code from the on-line programs and incorporating them with new code to create Book Plus. This was in violation of Paragraph 12 of the Termination Agreement restricting use of the licensed software to that expressly permitted by the Termination Agreement. Such copying was not permitted by that agreement, expressly or otherwise.

### Copyright Infringement

An initial issue to resolve in the copyright infringement claim is whether PRC owns what was purportedly copyrighted. Ownership is also an issue in the breach of contract claim, because it is the position of NAR that Multi–List, and consequently PRC, transferred, in the form of Spectrum, the software which was the subject of the Termination Agreement, to Realtron. Thus, the argument goes, any right to the RCS/MLS software belonged and belongs to Realtron, and PRC has breached its warranty in the Termination Agreement that it was the sole owner of the software. Such lack of ownership also would deprive the plaintiff of entitlement to copyright protection.

The court rejects the argument.

■ After Realtron's purchase of Multi–List, Multi–List began developing an enhancement of the CASH software system called Spectrum. By November 5, 1987, the Spectrum on-line system was substantially different from the CASH system which was given to NAR in source code form pursuant to the Termination Agreement. As part of the November 5, 1987 purchase by PRC of Multi–List from Realtron, Multi–List assigned all of its rights and interest in Spectrum to Realtron. It is NAR's position that this included all of Multi–List's interest in CASH, so that PRC, as Multi–List's successor, owns no interest in CASH. Support for this is said to be in the omission of any reference to CASH from the schedule of property represented as being owned by Multi–List (Schedule 4.7.3, DX 4) at the time of the purchase of Multi–List by PRC. Although that schedule refers only to Spectrum, it is inconceivable that PRC or Multi–List would dispose of Multi–List's core asset, the CASH software system. The omission from the schedule was bound to have been inadvertent. The terms of the contemporaneous reassignment by Realtron to Multi–List and PRC (DX 6), for limited purposes, confirms this. The reassignment allowed Multi–List and PRC to meet commitments Multi–List already had on the Spectrum system which had been assigned to Realtron, and Paragraph 2.c. of the reassignment evidences Realtron's fear that Multi–List and PRC might enhance the reassigned system so as to compete with what Multi–List had just assigned to Realtron. That Multi–List would continue to own and market the CASH system after the purchase of Multi–List by PRC was intended and discussed prior to the purchase. Thus, although there is a conflict in the testimony on this issue, and some of the documents might support a contrary finding, the court finds that not only is there a present CASH software system, separate from what was transferred as Spectrum to Realtron, but

this CASH software system remained and is now owned by PRC.

Having found that PRC, not Realtron, owns the software at issue, the remaining issue as to copyright infringement is the validity of the registrations.

■ Although the copyright registration applications were not filed until after this action was filed, this does not deprive the copyright owners of the prescription accorded registration by 17 U.S.C. § 410(c).[7] In an unpublished work, where the registration is accomplished, as here, prior to publication, the prescriptions of § 410(c) are available. The registration is, after all, merely the plaintiff's "ticket" to court; the protection of the copyright arises at the time of the creation of the work.

■ Most of NAR's attack on the validity of the registration centers on its assertion that PRC did not own the underlying work that it sought to register, namely, the CASH system and the interface program. The court has resolved this issue adversely to NAR in the previous part of this opinion. Under *Stewart v. Abend,* — U.S. ——, 110 S.Ct. 1750, 109 L.Ed.2d 184 (1990), assignment of rights in a derivative work such as Spectrum would not operate to transfer a copyright in the underlying work in the absence of specific language to that effect. No such language is present here.

■ The issue of publication is still to be resolved, but it poses no substantial question. The work was not made available to the general public without restriction. The only "giving away" occurred under tightly restricted terms, e.g., confidentiality and restrictions on sublicensure to a competitor, and on release of source codes. This is not publication.

The defendant has not refuted the presumption afforded by § 410(c).

■ NAR also argues that what was copyrighted was not what was licensed.

PX 289, which contains the interface program and the CASH on-line system programs, was not deposited with the Copyright Office in its entirety. However, identifying portions of the programs were deposited. This is sufficient.

■ The court rejects also the claim of estoppel put forth by NAR; and the errors pointed out in the application such as titles, date of completion, even if incorrect, do not go to the *validity* of the copyright.

Finally, as to the copyright claim, the evidence is very persuasive that NAR, in its marketing and sale of Book Plus, copied substantial portions of the copyrighted work, both the CASH on-line system and the interface program [PX 541, testimony of Masters, (PX 311, 511–537), and testimony of Delutis (PX 538, 539) ]. The testimony of Delutis with reference to the "footprints," the court found particularly convincing.

### Breach of Duty of Agent to Principal and Breach of Fiduciary Duty

■ The court rejects the claim asserted under these theories. The Termination Agreement eliminated the prior appointment of NAR as the "wholesale agent" for Book Services Contracts, and, although this alone would not negate any agency relationship, the court is not persuaded that the breaches by NAR were in its capacity as agent so that the obligations breached rise to a level beyond ordinary breaches of contract.

The Termination Agreement between the parties was negotiated at arm's length, and the relationship between them is no more than contractual. Neither has been shown to have imposed any trust in the other beyond that called for by the contracts. No fiduciary duty is involved.

### Intentional Interference with Contract

■ The court has found that by entering into competition with PRC the defen-

---

**7.** "(c) In any judicial proceedings the certificate of a registration made before or within five years after first publication of the work shall constitute prima facie evidence of the validity of the copyright and of the facts stated in the certificate. The evidentiary weight to be accorded the certificate of a registration made thereafter shall be within the discretion of the court."

dant has breached its contract with and violated the copyrights of PRC. That NAR was motivated by its own competitive interests, although not alone sufficient to justify conduct which interfered with the contract rights PRC had with its customers, coupled with the economic right of its own which it sought to protect, negates any finding of intentional interference. Moreover, in this case the damages flowing from the breach of contract and copyright claims duplicate those which would flow from the intentional interference claim; and no useful purpose would be served by a finding on the last claim as supporting a separate entitlement to recover. The intentional interference claim will be dismissed.

### Damages

■ The damages claimed by the plaintiff as lost profits are summarized in PX 503. The lost profit figure totals $13,873,-800. The court concludes that a substantial portion of this figure is speculative. For example, the renewal rates on PRC accounts lost are longer than it is reasonable to predict. Allowing renewal rates at all on accounts that PRC never had is too speculative. The cost figure used by the plaintiff on the large Denver account was underestimated in determining the profit to be expected on that account. The court finds the testimony and report of the defendant's expert, Richman (DX 165), and the reasoning by which he supported his opinions to be more persuasive than the testimony of the plaintiff's expert, Naddeo. The court disagrees with NAR that *all* of the claimed loss of profit damages are too speculative to support an award, but it does agree that the reasonable damages claimed should be reduced to that testified to by NAR's own witness, namely, $5,658,-753.

■ The plaintiff also asserts a claim for profits which NAR realized on its sale of Book Plus. The amount claimed is $2,190,686. Such a claim is authorized by 17 U.S.C. § 504(b); however, such profits may only be allowed to the extent that they are not taken into account in computing the plaintiff's actual damages. Here the actual damages claimed, and allowed by the court, are made up, among other items, of "PRC accounts lost to NAR" and "Accounts Never Had Lost to NAR." To allow lost profits in these categories and also allow PRC to recover the profits NAR made on its sales, would be a double recovery. This applies to both the copyright claims and the breach of contract. The profits realized by NAR will not be allowed.

### Other Relief

The plaintiff is also entitled to injunctive relief, and a declaration that the Termination Agreement is terminated. Punitive damages will not be awarded, wilfulness not having been proved. Although the form of order tendered by the plaintiff contemplates a direction to NAR to pay a royalty, no evidence is before the court warranting such relief or establishing what would be the appropriate amount of such a royalty. Prejudgment interest on the award, other than that already included in the $5,658,753 figure, will not be allowed, nor any amount for the loss of value to PRC as a whole because of NAR's failure to exercise its best efforts.

### ORDER

For the reasons set forth in the Memorandum Opinion this day filed, it is hereby ORDERED that:

1. The Termination Agreement dated February 28, 1986 shall be terminated effective immediately.

2. The National Association of Realtors (NAR), their officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with them who receive actual notice by personal service or otherwise, shall not grant any future licenses of, or install or to cause to be installed, or use or cause to be used, any version (including current versions) of the CASH on-line system licensed by Multi-List or PRC to NAR, and any derivative works based thereon.

3. NAR, their officers, agents, servants, employees and attorneys, and those persons in active concert or participation

with them who receive actual notice by personal service or otherwise, shall not grant any future licenses of, or install or to cause to be installed, or use or cause to be used, any version (including current versions) of the Book Plus software.

4. NAR may maintain all sublicenses of RCS/MLS and all licenses of Book Plus in place as of the date of this order. However, NAR may not assign or otherwise transfer such sublicenses or licenses or the RCS/MLS or Book Plus software, except to PRC.

5. NAR may independently create a new on-line system and a new in-house book publishing system, but no part of CASH, RCS/MLS, or Book Plus may be used, reproduced, called, or incorporated into such new systems.

6. Judgment is entered in favor of the Plaintiff, PRC Realty Systems, Inc., against the defendant, National Association of Realtors, in the amount of $5,658,753, plus costs.